ORIGINAL

Rev. 97

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br><br>WEI LAI, aka "Julia,"<br>JOEL ELDER,<br>JIANYING HUANG, aka "Jonathan Huang,"<br>aka "Jonnyson,"<br>XIAOQIONG HOU, aka "Joanne Hou," aka<br>"Joan Hou,"<br>REBECCA HO, aka "Rebecca Chang,"<br>aka "Chia Lin Chang Hsu,"<br>YU LING WANG, KEEN WAI CHOO, aka<br>"Alvin Choo," aka "Alven Choos." | DOCKET NO.<br>11-1559M<br><br>MAGISTRATE'S CASE NO.<br>11-_____M<br><br>FILED<br>CLERK, U.S. DISTRICT COURT<br>JUN 30 2011<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY _____ DEPUTY |

| Complaint for violation of 18 U.S.C. § 371 (Conspiracy) | | |
|---|---|---|
| NAME OF MAGISTRATE JUDGE<br><br>Hon. Michael R. Wilner | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br><br>Los Angeles County, CA |
| DATES OF OFFENSE<br>Beginning on a date unknown and continuing through on or about August 5, 2010 | PLACE OF OFFENSE<br>Los Angeles County<br>and elsewhere | ADDRESS OF ACCUSED (IF KNOWN) |

| COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION: |
|---|
| SEE ATTACHMENT |

| BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED: |
|---|
| (See attached affidavit which is incorporated as part of this Complaint) |
| MATERIAL WITNESSES IN RELATION TO THIS CHARGE: |

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>Lynn M. Henry<br><br>OFFICIAL TITLE<br>Special Agent<br>Homeland Security Investigations |
|---|---|

| Sworn to before me and subscribed in my presence, | |
|---|---|
| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br><br>June 30, 2011 |

1) See Federal Rules of Criminal Procedure rules 3 and 54.

WLH;wlh     REC: detention

ATTACHMENT

## I.   BACKGROUND

1.   The United States Customs and Border Protection ("CBP") is responsible for the assessment and collection of duties, taxes, and fees on merchandise imported into the United States.

2.   When a shipment of foreign goods reaches the United States, the importer or consignee must file entry documents for the merchandise, which provide specific information relating to the imported goods, such as an accurate description of the merchandise, the sales price of the merchandise, and the terms of sale, and all costs and services determined by law to be dutiable.   Entry documents may be filed electronically and includes documents such as invoices, visas, packing list, bill of lading, and CBP forms, such as Form 7512 (Transportation Entry), Form 3461 (Entry/Immediate Delivery) and Form 7501 (Entry Summary).   CBP relies on entry documents to assess the proper duties and taxes for the imported merchandise.

3.   Importers may hire Customs brokers who prepare and file the necessary Customs entries, arrange for the payment of duties, secure the release of merchandise in Customs custody, and represent their clients in other Customs related matters. Customs brokers must be licensed by CBP and are subject to U.S. government regulations.

4.   CBP uses an electronic system called the Automated Commercial System ("ACS") to track, control, and

process all commercial goods imported into the United States by filing, clearing, and storing necessary customs paperwork electronically.

5.   Customs brokers submit electronic filings to CBP using the Automated Broker Interface ("ABI"), which interfaces with ACS and involves the use of wire communications in interstate and foreign commerce.

6.   "In-bond" movements allows for the transit of foreign merchandise within the United States that is not intended for formal entry into the United States.  For example, shipments of merchandise destined for Mexico from China are allowed to transit through the United States, at a U.S. border port, on its way to Mexico.  In-bond merchandise is not subject to U.S. Customs duties and taxes because the merchandise is not entered into United States commerce.  Two common types of in-bond movements are:

a.   Entry for Immediate Transportation ("I.T."), which allows imported merchandise arriving at one U.S. port of entry to be entered for transportation in-bond to any other port of entry of the importer's choosing for final Customs clearance;

b.   Entry for Transportation and Exportation ("T&E"), which allows imported merchandise arriving at one U.S. port of entry to be transported under bond to a second U.S. port of entry before exportation to its destined country.

2

7.   A "foreign trade zone" ("FTZ") is a secured area under CBP supervision, located in or near a CBP port of entry, that is generally considered to be outside CBP territory and known internationally as a free-trade zone.  FTZ sites are subject to the laws and regulations of the United States and are generally described as follows:

a.   FTZs are sponsored by qualified public or private corporations that may operate the facilities themselves or contract for the operation;

b.   A general-purpose FTZ provides leasable storage and distribution space to users in general warehouse-type buildings with access to various modes of transportation;

c.   Foreign merchandise may be moved into a FTZ for operations (not otherwise prohibited by law), including storage, exhibition, assembly, manufacturing, and processing;

d.   FTZ operations encourage U.S.-based operations by removing certain disincentives associated with manufacturing in the United States.  For example, because the duty on a product manufactured abroad and imported in the U.S. is assessed on the finished product rather than on its individual parts, materials, and components, a U.S. based manufacturer finds itself at a disadvantage compared with its foreign competitor when it must pay a higher rate on parts, materials, and components imported for use in a manufacturing process.  The FTZ

3

corrects this imbalance by treating products manufactured and assembled in the FTZ, for the tariff assessment, as if it were manufactured abroad;

       e.   Under FTZ procedures, the usual formal CBP entry procedures and payments of duties are not required on foreign merchandise entering the zone unless and until it enters CBP territory for domestic consumption (i.e. the merchandise enters commerce in the United States), at which point the importer generally has the choice of paying duties at the rate of either the original foreign materials or the finished product; and

       f.   CBP is responsible for the transfer of merchandise into and out of a FTZ and for matters involving the collection of revenue.

II.  <u>GENERAL ALLEGATIONS</u>

      At all times relevant to this ~~Indictment~~ Complaint

      8.   Defendant WEI LAI, also known as ("aka") "Julia" ("defendant LAI"), was the owner, operator, and president of a Customs bonded and licensed FTZ called Southern California 3rd Party Logistics and Industry Free Trade Zone, dba Industry Free Trade Zone ("Industry FTZ").  Defendant LAI was the registered agent for service for Industry FTZ and the sole authorized signatory for Industry FTZ's bank account, East West Bank ("EW") account ending in 577 (the "Industry FTZ bank account").

<div align="center">4</div>

9.   Defendant LAI controlled, by power of attorney, the following "straw" bank accounts, which were opened in the names of LAI's family members and friends and used to conceal illicit funds and to avoid detection from law enforcement:

a.   Bank of the West ("BW") account number ending in 673, in the name of Hongwen Peng ("straw account 1");

b.   BW account number ending in 865, in the name of Qixing Lai ("straw account 2");

c.   BW account ending in 691, in the name of Yonghe He ("straw account 3");

d.   EW account ending in 760, in the name of Honghe He ("straw account 4");

e.   EW account ending in 927, in the name of Qixing Lai ("straw account 5");

f.   EW account ending in 867, in the name of Yonggang FEI ("straw account 6").

(Straw accounts 1 through 6 are herein collectively referred to as the "straw accounts").

10.   Defendant JIANYING HUANG, aka "Jonathan Huang," aka "Jonnyson" ("defendant HUANG"), doing business as Pacific Garment, Sealand International Limited ("Sealand"), New Live Inc., and Miracle Mountain Inc., imported wearing apparel from the People's Republic of China ("China") through Industry FTZ.

11.   Defendant XIAOQUIONG HOU, aka "Joanne Hou," aka "Joan

Hou" ("defendant HOU"), doing business as Pacific Garment,
Sealand, New Live Inc., and Miracle Mountain Inc., imported
wearing apparel from China through Industry FTZ.

12.   Defendant REBECCA HO, aka "Rebecca Chang," aka "Chia
Lin Chang Hsu," ("defendant HO"), doing business as Pacific
Garment, Sealand, New Live Inc., and Miracle Mountain Inc.,
imported wearing apparel from China through Industry FTZ.

13.   Industry FTZ utilized the Customs brokerage company
ITC-Diligence Inc. ("ITC-Diligence") to act as the Customs broker
for defendants HUANG, HOU, HO, and others known and unknown
          importing shipments that contained wearing apparel
from China ("China shipments").   Defendant JOEL ELDER ("defendant
ELDER") operated ITC-Diligence, which was located within the
premises of Industry FTZ.   As a Customs broker, defendant ELDER
submitted electronic filings to CBP, using ABI, which falsely
reflected in-bond movement of China shipments through Industry
FTZ and which falsely and fraudulently represented the value of
the China shipments and duties owed to CBP upon entry.

14.   YU LING WANG ("defendant WANG") coordinated the in-bond
movement of China shipments with defendants LAI, ELDER, HUANG,
HOU, and HO.

15.   Defendant KEEN WAI CHOO, aka "Alvin Choo," aka "Alven

6

Choo" ("defendant CHOO"), doing business as "Howell Logistics,"
received imported wearing merchandise from China through Industry
FTZ.

III. OBJECTS OF THE CONSPIRACY

16.  Beginning on a date unknown to the Grand Jury and
continuing through on or about August 5, 2010, in Los Angeles
County, within the Central District of California, and elsewhere,
defendants LAI, ELDER, HUANG, HOU, HO, WANG, and CHOO, together
with others known and unknown to the Grand Jury, knowingly
combined, conspired, and agreed to commit the following offenses
against the United States:

        a.   To transmit and cause to be transmitted by means
of wire communication in interstate and foreign commerce, any
writings and signals for the purpose of executing a scheme to
defraud and obtain money and property by means of false and
fraudulent pretenses, in violation of Title 18, United States
Code, Section 1343 (Wire Fraud); and

        b.   To fraudulently and knowingly import and bring
into the United States merchandise, namely, wearing apparel,
contrary to law, in violation of Title 18, United States Code,
Section 545 (Smuggling).

IV.  MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE
     ACCOMPLISHED

     17.  The objects of the conspiracy were carried out, and to

7

be carried out, in substance, as follows:

    a.   Chinese importers, such as defendants HUANG, HOU, HO, and others known and unknown to ~~this grand jury~~ , would pay defendant LAI, doing business as Industry FTZ, to undervalue shipments of imported merchandise, namely wearing apparel from China, so that the importers would be charged less duty at the time of entry (the "undervaluation scheme").  For example, defendants LAI and ELDER would file entry for a shipment of wearing apparel undervalued at $1.00 per unit, when defendant LAI knew the wearing apparel should have been valued at least $4.00 per unit.

    b.   Chinese importers, such as defendants HUANG, HOU, HO, and others known and unknown ~~to this grand jury~~ , would pay defendant LAI, doing business as Industry FTZ, to file entry for mis-classified shipments of imported merchandise, namely wearing apparel from China, in order to pay a lower duty rate for the merchandise at the time of entry (the "mis-classification scheme").  For example, defendants LAI and ELDER would file entry for a shipment of "woven pants" at a 2.8% duty rate when defendants LAI and ELDER, knew the shipment contained denim wearing apparel, which should have been taxed at a 16.6% duty rate.

    c.   Defendant ELDER, doing business ITC-Diligence, would assign I.T. in-bond numbers for China shipments to be

<div align="center">8</div>

transported to Industry FTZ and then submit filings to CBP, using ABI, which falsely reflected I.T. in-bond movement of those China shipments to Industry FTZ (the "I.T. in-bond diversion scheme").

d.   Chinese importers, such as defendants HUANG, HOU, HO, and others known and unknown ~~to the ~~~~~~~~~~~~~~, would pay defendant LAI, doing business as Industry FTZ, to submit filings to CBP, which falsely and fraudulently reflected that China shipments had moved in-bond from Industry FTZ to another port o entry for exportation to Mexico (the "T&E in-bond diversion scheme").  In the T&E in-bond diversion scheme, defendants LAI, ELDER, and WANG would arrange for the delivery of China shipments to various warehouses in California for direct consumption in U.S. commerce.  Through the T&E in-bond diversion scheme, importers, such as defendants HUANG, HOU, HO, would avoid final Customs clearance of the China shipments and the payment of any tariffs and duties on the imported merchandise (wearing apparel).

e.   In the T&E in-bond diversion scheme, defendant ELDER would submit filings to CBP, which falsely and fraudulently represented that the bonded carrier Camacho Brokers, Inc., dba Camacho Trucking ("Camacho Trucking"), had transported China shipments from Industry FTZ to a port of entry for exportation to Mexico.  Defendants LAI, ELDER, and WANG would use Camacho Trucking's name in CBP filings without Camacho Trucking's authorization and knowledge.

9

f.    Defendant CHOO, doing business as Howell Logistics and working with defendant HUANG, would accept undervalued, mis-classified, and diverted in-bond shipments at Howell Logistics's warehouse in Fullerton, California.

g.    Defendant LAI would charge importers approximately $6,000 to $10,000 for each shipment diverted through the T&E and I.T. in-bond diversion schemes.

h.    Defendants LAI and WANG would instruct importers, such as defendants HUANG, HOU, and HO, to wire transfer nominal amounts of money into the Industry FTZ bank account for purported "Warehouse Services" related to diverted China shipments and to wire transfer the majority of the payments ($6,000 to $10,000 per diverted China shipment) into straw accounts operated and controlled by defendant LAI.

V.   OVERT ACTS

18.   In furtherance of the conspiracy, and to accomplish its objects, defendants LAI, ELDER, HUANG, HOU, HO, WANG, and CHOO, together with others known and unknown ~~to the Grand Jury~~, committed the following overt acts, among others, in the Central District of California and elsewhere:

Overt Act No. 1:     On or about February 18, 2010, in email communications, LAI, WANG, and HOU received instructions to pick up the 865 shipment from the seaport and to deliver the shipment

10

to CHOO's warehouse, Howell Logistics, located in Fullerton, California.

Overt Act No. 2:   On or about February 21, 2010, defendant ELDER, doing business as ITC-Diligence, assigned an I.T. in-bond number to the 865 shipment and filed a transportation entry (CBP Form 7512), which reflected that the 865 shipment had moved in-bond from the seaport to Industry FTZ.

Overt Act No. 3:   On or about February 23, 2010, in an email communication, defendant WANG informed defendant LAI that the 865 shipment had been "unloaded" at Howell Logistics in Fullerton, California, and ELDER indicated that it was safer and better to deliver the China shipments directly to the warehouse.

Overt Act No. 4:   On or about March 2, 1010, in an email communication, defendants LAI and WANG provided defendants HUANG and HO with an invoice for the 865 shipment and instructed defendant HUANG to wire transfer a nominal amount into the Industry FTZ bank account for purported warehousing services.

Overt Act No. 5:   On or about March 5, 2010, defendant HUANG wire transferred approximately $39,980.00 into straw account 3 as payment for four Miracle Mountain shipments that had been filed for in-bond movement through Industry FTZ – including the 865 shipment.

Overt Act No. 6:   On or about March 29, 2010, in an email communication, defendant LAI advised defendant WANG that

11

defendant ELDER was having trouble finding a trucking company who would go to their "destination warehouse in Mexico."

Overt Act No. 7:   On or about April 11, 2010, in an email communication, defendant LAI advised defendant HUANG and defendant HO that incoming China shipments should be consigned to RCW International Inc. ("RCW") and delivered to the warehouse in Fullerton (CHOO's Howell Logistics) in order to "avoid any hassels."

Overt Act No. 8:   On or about April 26, 2010, in an email communication, defendant LAI asked defendant HO to refer a freight forwarder to defendant LAI because defendant LAI needed "legitimate business badly."

Overt Act No. 9:   On or about June 15, 2010, in an email communication, defendants LAI, WANG, and HOU received a commercial invoice for a China shipment consigned to RCW shipment, which contained 750 cartons of wearing apparel that had been valued on the invoice at approximately $132,251.35 (the "750 shipment").

Overt Act No. 10:   On or about June 17, 2010, in an email communication, defendants LAI, WANG, and HOU received instructions to pick up the 750 shipment from the seaport and to deliver the shipment to Howell Logistics in Fullerton, California

Overt Act No. 11:   On or about July 1, 2010, defendant HUANG, doing business as Sealand, wire transferred approximately $4,168.46 into the Industry FTZ bank account for payment of the 750 shipment and 3 other shipments.

12

## AFFIDAVIT

I, Lynn M. Henry, being duly sworn, hereby depose and state as follows:

### I.

### INTRODUCTION

1.    I am a Special Agent ("SA") with the Department of Homeland Security, United States Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI") and have been so employed since November 2001.  I am currently assigned to the HSI Office of the Special Agent in Charge, Los Angeles ("SAC/LA"), Los Angeles, California.  Prior to my current assignment I was assigned to the HSI Office of the Assistant Special Agent in Charge at the Los Angeles International Airport ("ASAC/LAX"), and prior to that I was assigned to the United States Customs Service, Office of the Resident Agent in Charge, Dallas, Texas.  HSI is responsible for enforcing federal criminal statutes involving, but not limited to, Title 18, United States Code, Section 371, conspiracy to commit offense or to defraud the United States; Title 18, United States Code, Section 541, entry of goods falsely classified; Title 18, United States Code, Section 542, entry of goods by means of false statements; Title 18, United States Code, Section 544, relanding of goods; Title 18, United States Code, Section 545, smuggling goods into the United States; Title 18, United

1

States Code, Section 1001, statements or entries generally; Title 18, United States Code, Section 1343, fraud by wire, radio, or television; Title 18, United States Code, Section 1956, laundering in monetary instruments.

2.   I am currently assigned to the Trade Fraud Group at SAC/LA, which investigates international cargo, violative international trade practices and intellectual property rights ("IPR") violations at the Long Beach, California seaport, committed against the United States.  I have received training in the detection and investigation of HSI violations, including fraud, IPR violations, and smuggling at the Federal Law Enforcement Training Center in Glynco, Georgia.  While conducting various investigations during my time with HSI and prior to that with the United States Customs Service, I have gained extensive knowledge of the United States Customs and Border Protection ("CBP") authority and laws.

3.   This affidavit is made in support of an application for the following and does not purport to set forth all of my knowledge of, or investigation into, this matter:

a.   a search warrant for 14967 East Salt Lake Avenue, City of Industry, California, 91746 ("**SUBJECT PREMISES**"), as described further below and in Attachment A, based upon probable cause to believe that the **SUBJECT PREMISES** will contain evidence and instrumentalities of violations of Title 18, United States

2

Code, Section 544 (Relanding of Goods); Title 18, United States
Code, Section 545 (Smuggling); Title 18, United States Code,
Section 1343 (Wire Fraud); Title 18, United States Code, Section
1956 (Money Laundering); Title 18, United States Code, Section
1001 (False Statements); and Title 18, United States Code,
Section 371 (Conspiracy);

       b.   a complaint and arrest warrant for the following
seven individuals (collectively referred to as "Cell 1") based
upon probable cause to believe that Cell 1 conspired to commit
an offense and defraud the United States, in violation of 18
U.S.C. § 371:

       i.   WEI LAI, also known as ("aka") "Julia,"

       ii.   JOEL ELDER;

       iii. JIANYING HUANG, aka "Jonathan Huang," aka
"Jonnyson,"

       iv.  XIAOQIONG HOU, aka "Joanne Hou," aka "Joan
Hou,"

       v.   REBECCA HO, aka "Rebecca Chang," aka "Chia
Lin Chang Hsu,"

       vi.  YU LING WANG,

       vii. KEEN WAI CHOO, aka "Alvin Choo," aka "Alven
Choos;" and

       c.   a complaint and arrest warrant for the following
five individuals (collectively referred to as "Cell 2") based

upon probable cause to believe that Cell 2 conspired to commit an offense and defraud the United States, in violation of 18 U.S.C. § 371:

      i.   WEI LAI, also known as ("aka") "Julia,"

      ii.  JOEL ELDER;

      iii. DAVID HARLOW

      iv.  TAYLOR WONG, aka "David Wong," aka "Hong Yuen Wong," aka "Vincent,"

      v.   TSU WEI LIN, aka "Nick," aka "Tsu Wei Wei," aka "Tsu Wei Ching."

4.    As reflected further herein, conclusions I have reached during this investigation are based upon my own training and personal experience, discussions with CBP Officers, discussions with CBP import specialists, discussions with other law enforcement personnel, audio recorded conversations between LAI and a cooperating source ("CS"), intercepted wire communications (pursuant to federal wiretap), and the review of various records and documents, including CBP electronic filing documents, bank account records, and email communications (pursuant to federal search warrant).

## II.

## PREMISES TO BE SEARCHED

5.    The premises to be searched, as described in Attachment A and below, is located at 14967 East Salt Lake

Avenue, City of Industry, California, 91746, and is a CBP bonded and licensed foreign trade zone designated under CBP port code 2783 (the "SUBJECT PREMISES"). The SUBJECT PREMISES is a multi-unit warehouse facility with adjoining offices located on the north side of East Salt Lake Avenue, which runs East and West between South Seventh Avenue and Turnbull Canyon Road (South of a drain canal that runs East and West). The SUBJECT PREMISES is further described as having a stucco exterior, cream in color, with painted stucco trim, light teal green in color, that is located approximately a third of the way down from the roof line. The entrance to the adjoining office section of the SUBJECT PREMISES is located on the west side of the warehouse facility and is the second accessible office entrance from East Salt Lake Avenue (or the south side of the warehouse facility). The office entry for the SUBJECT PREMISES is described as having tinted glass with brown trimmed casings for the office entryway door and surrounding windows, and has an upper fascia of red tiles above the tinted glass door and adjacent windows. Above the office entryway door are white numbers that read "14967" written horizontally on tinted glass. The East side of the warehouse facility consists of varying sizes of bay roll-up doors and loading docks that are either cream in color or light teal green in color. A sign located at the East side of the facility, above two roll-up doors and a metal exit door, reads

"CUSTOMS AND BORDER PROTECTION WARNING.   VEHICLE IS SUBJECT TO SEARCH.   UNDER THE CUSTOMS & BORDER PROTECTION LAWS OF THE UNITED STATES, VEHICLES CONTAINING CONTRABAND & THE CONTRABAND WILL BE SEIZED AND SUBJECT TO FORFEITURE.   TITLE 19 U.S.C. 482, 1581 & 1595a.   CBP PORT DIRECTOR, CUSTOMS AND BORDER PROTECTION, DEPARTMENT OF HOMELAND SECURITY."

## III.

## APPLICABLE STATUTES AND DEFINITIONS

6.   Title 18, United States Code, Section 371 states in pertinent part, that if two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be punished as provided in the statute.

7.   Title 18, United States Code, Section 541 states, in pertinent part that whoever knowingly effects any entry of goods, wares, or merchandise, at less than the true weight or measure thereof, or upon a false classification as to quality or value, or by the payment of less than the amount of duty legally due, shall be punished as provided by the statute.

8.   Title 18, United States Code, Section 542 states, in pertinent part, that whoever enters or introduces into the commerce of the United States any imported merchandise by means

6

of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance, or makes any false statement in any declaration without reasonable cause to believe the truth of such statement, or procures the making of any such false statement as to any matter material thereto without reasonable cause to believe the truth of such statement, whether or not the United States shall or may be deprived of any lawful duties.

9.    Title 18, United States Code, Section 544 states, in pertinent part, that each person concerned with any merchandise entered or withdrawn for exportation without payment of the duties thereon, or with intent to obtain a drawback of the duties paid, or of any other allowances given by law on the exportation thereof, is relanded at any place in the United States without entry having been made, such merchandise shall be considered as having been imported into the United States contrary to law.

10.   Title 18, United States Code, Section 545 states, in pertinent part, that whoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces or attempts to smuggle or clandestinely introduce into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through

7

the customhouse any false, forged, or fraudulent invoice, or other document or paper; or whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law.

11.   Title 18, United States Code, Section 1343, states in pertinent part that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be punished as provided by the statute.

12.   Title 18, United States Code, Section 1956(a)(1), provides in pertinent part, that whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity, with the intent to promote the carrying on of specified criminal activity, shall be punished as provided in the statute.

8

IV.

## BACKGROUND REGARDING IMPORTATION OF MERCHANDISE

13.   The following background information is provided to explain in succinct some of the United States customs processes. These definitions and supporting statutes of law are provided here in part only and do not purport to be all of the customs processes, statutes, or policy.

14.   Based upon my training and experience, I know the following information:

a.   ICE, in conjunction with and through CBP, is responsible for administering the Tariff Act of 1930, as amended, as well as bilateral trade agreements between the United States and other governments.   A portion of that responsibility includes the assessment and collection of duties, taxes and fees on merchandise imported into the United States. When a shipment reaches the United States, the importer or consignee must file entry documents with CBP for the merchandise being entered.   ICE investigates fraudulent importation practices with respect to CBP's collection of revenue and documents on imported merchandise.

b.   When a shipment of goods reaches the United States, an importer files entry documents with CBP.   The term "entry documents" is defined as the documentation (including commercial invoice, packing list, bill of lading, and CBP forms)

9

required to be filed with the appropriate CBP Officer to secure release of imported merchandise from CBP custody.

   c.   Pursuant to Title 19, United States Code, Section 1484, the importer of record, or their authorized agent, must file certain entry documents with CBP concerning the goods.  Entry documents must provide specific information relating to the imported goods.  These documents, referred to as the "Entry Package," include invoices, visas, bills of lading, packing lists, and CBP forms 3461 (Entry/Immediate Delivery) and 7501 (Entry Summary).  CBP assigns a unique entry number to each entry.  CBP relies upon the documents filed in the Entry Package to provide an accurate description of the merchandise, the sales price, the terms of sale and all costs or services determined by law to be dutiable by CBP in order for CBP to assess the proper duties for the merchandise.

   d.   Pursuant to the Customs Modernization Act of 1993, importers, customs brokers, consignees, importer of record, declaration filers, entry filers, or other parties must maintain records if they import merchandise into the customs territory of the United States, transport or store merchandise carried or held under bond or knowingly cause the import, transport, or storage of merchandise carried or held under bond into or from the customs territory of the United States.

   e.   Pursuant to Title 19, United States Code, Section 1508, any owner, importer, consignee, importer of record, entry filer, or

10

other party who imports, or knowingly causes any merchandise to be imported into the United States, shall keep records, including, but not limited to: statements, declarations, documents, and electronically generated or machine-readable data, which pertains to any such importation and which are normally kept in the ordinary course of business.  The applicable regulation governing the record retention period states that these records must be maintained for a period of five (5) years from the date of merchandise entry. Frequently importers will hire a customs broker to file the appropriate entry documents as described above.  Customs brokers are licensed and subject to government regulations.

     f.   Pursuant to Title 19, Code of Federal Regulation, Section 162.6, CBP has the authority to target, divert, and conduct examination of cargo shipments that are imported into the United States.  The Automated Commercial System ("ACS") is an electronic system used by CBP to track, control, and process all commercial goods imported into the United States.  ACS facilitates merchandise processing, significantly cuts costs, and reduces paperwork requirements for both CBP and the trade community by allowing necessary customs paperwork to be filed, cleared, and stored with CBP electronically.

     g.   Pursuant to Title 19, United States Code, Section 1595a(c)(1)(A), any merchandise that has been smuggled, or clandestinely imported or introduced into the United States contrary

to law, may be detained and/or seized and forfeited by CBP.  Title 19, United States Code, Section 1499, gives ICE border search authority that extends into any port of entry or port of export into or out of the United States.

h.    Customs broker - Customs brokers must pass an examination and background check to become licensed by CBP, however they are not employed by the United States government.  Customs brokers are typically hired to "clear" goods which may involve the preparation of documents and/or electronic submissions, the calculation (and usually the payment) on behalf of the client (importer) of taxes, duties and excises, and facilitate communication between the importer/exporter and governmental authorities.

g.    Import Specialist - An Import Specialist ("IS") is employed by CBP and is responsible for classifying and appraising a portion of the billions of dollars worth of commercially imported merchandise that enters the United States every year.  Often times Import Specialists determine which products may legally enter the United States by enforcing laws protecting public health and safety, intellectual property rights and fair trade practices.

h.    Air Waybill ("AWB") - A non-negotiable receipt or document issued by an international courier company for goods and evidence of the contract of carriage.  The AWB has a tracking number which can be used to check the status of delivery, and current position of the shipment.

12

A.    **In-Bond System and Exploitation of the In-Bond System**

15.    The In-Bond system, designated and defined under Title 19 United States Code, Sections 1552 and 1553, allows merchandise not intended for entry into United States commerce to transit the United States.    In-Bond movements allowed under United States law are valuable to the trade community since they help alleviate port congestion and facilitate trade by allowing importers to move cargo more efficiently.    For example, a sea container shipment of merchandise from China destined for Mexico would normally arrive and be imported at one of the seaports along the Pacific coast, such as Los Angeles, San Francisco, or Seattle.    The In-Bond system would allow the merchandise to be domestically transported through the United States to a southwest border port before it is exported to its final destination, Mexico.    The merchandise was never formally entered into United States commerce and therefore not subject to Customs duties and/or taxes.    When conducted properly, In-Bond transactions facilitate trade by allowing the use of United States infrastructure for the transportation of goods to foreign markets or to another United States port.

16.    However, the In-Bond system has also been exploited.    In-Bond merchandise can be diverted into the United States, which can result in the smuggling of restricted or high duty items and merchandise.    This practice of "In-Bond diversion" can endanger the public health, hurt the United States economy, restrict the

13

competitiveness of the United States in the global market and possibly finance the illegal activities of organized crime and terrorist organizations.

17.  Two common types of In-Bond movements are:

a.  An Immediate Transportation ("I.T.") bond entry allows for the following:  any merchandise, other than explosives and merchandise the importation of which is prohibited, arriving at a port of entry in the United States may be entered for transportation in-bond, without appraisement, formal entry or payment of duty, to any other port of entry of the importer's choosing for final Customs clearance and payment of duties and/or taxes; and

b.  A Transportation and Exportation ("T&E") bond entry allows for any merchandise, other than explosives and merchandise the importation of which is prohibited, arriving at a port of entry in the United States, to be transported under a bond, without a formal Customs entry and payment of duty, through the United States, then exported from another port other than the original port of entry.  The goods are not consumed in the United States, and consequently no payment of Customs duties and/or taxes are imposed.

18.  As listed in Title 19, Code of Federal Regulation, Section 18.2(c)(2), except transit air cargo provided for in section 122.118 of this chapter, bonded merchandise destined to

14

a final port of destination in the United States, or for export from the United States, shall be delivered to Customs at the port of destination or exportation within 30 days after the date of receipt by the forwarding carrier at the port of origin, if transported on land.   If the merchandise is transported on board a vessel engaged in the United States coastwise trade, delivery to Customs at the port of destination or exportation shall be within 60 days after the date of receipt by the forwarding carrier at the port of origin.   Failure to deliver the merchandise within the prescribed period shall constitute an irregular delivery and the initial bonded carrier shall be subject to applicable penalties as provided in section 18.8.

### B.   Foreign Trade Zones

19.   A Foreign Trade Zone ("FTZ") is a restricted access site in, or adjacent to, a customs port of entry.   Authority for establishing these facilities is found in the FTZ Act of 1934 ("FTZA"), as amended in Title 19, United States Code, Sections 81a thru 81u.   The purpose of a FTZ as stated in the FTZA is to "expedite and encourage foreign commerce and other purposes."   The FTZA authorizes the FTZ Board, consisting of the Secretaries of Commerce and Homeland Security, to grant corporations the privilege of establishing, operating and maintaining FTZs.   The Secretary of Homeland Security assigns CBP officers to FTZs to protect the revenue and provide for admission of foreign merchandise into the customs territory from the FTZs.   The

15

principal interest and concern of customs (CBP) in the FTZ is control of merchandise moving to and from the FTZ, to see that all revenue is collected properly, and that all FTZ procedures are in compliance with the FTZA and all laws and regulations pertaining to FTZ use.

20. FTZs are treated, for purposes of the tariff laws and customs entry procedures, as being outside the customs territory of the United States. That is, merchandise admitted into a FTZ and is not subject to customs entry procedures. The importer ordinarily has a choice of paying duties either at the rate applicable to the foreign material in its condition as admitted into a FTZ, or, if used in manufacturing or processing, at the rate applicable to the emerging product.

21. Imported merchandise being transported to and from FTZs through the customs territory must be transported in-bond under the provisions of Title 19, Code of Federal Regulation, Sections 146.11 and 144.37(g). Vessels and carriers entering and leaving a FTZ are subject to the laws of the United States, except as otherwise provided in the FTZA. Vessels leaving a FTZ and arriving in the customs territory are subject to regulation under Title 19, Code of Federal Regulation, Part 4 – Transportation in Bond and Warehousing of Merchandise.

22. The operator of the FTZ is required to maintain all records, as defined in Title 19, Code of Federal Regulation, Section 163.1, and required under Title 19, Code of Federal

16

Regulation, Part 146, pertaining to FTZ merchandise for five years after the merchandise is removed from the FTZ.  In the case of merchandise which has been transferred from a FTZ to customs territory or is otherwise not exempt from the customs laws, records pertaining to importation which are required or made under Title 19, Code of Federal Regulation, Section 163.3 shall be kept for five years after the date of entry of the merchandise.

## C.   Automated Procedures and Electronic Filings

23.   Certain activity involving FTZs utilize federal agency automated procedures as established in Title 19, United States Code, Section 1411(a), which states in part that the Secretary shall establish the National Customs Automation Program which shall be an automated and electronic system for processing commercial importations.  Some of the existing components of the automation program are:  electronic entry of merchandise, electronic entry summary of required information, electronic transmission of invoice information, electronic transmission of manifest information, and the electronic payment of duties, fees and taxes.  Title 19, United States Code, Section 1411(c) provided that as of January 1, 2000, the automation program was also to include commercial importation data from the FTZs.  The electronically filed in-bond numbers during the in-bond diversion schemes were official transaction records transmitted

17

to CBP via wire through ACS.   The ACS "system owner" is the CBP
Office of Field Operations, Office of Administration, and Office
of International Trade, and the ACS mainframe interface system
or server is physically located in Springfield, Virginia.

22.   One of the automated programs is called the Automated
Manifest System ("AMS") which is a multi-modular cargo inventory
control and release notification system.   AMS interfaces directly with
Customs Cargo Selectivity and In-Bond systems, and indirectly with
Automated Broker Interface ("ABI"), allowing faster identification and
release of low risk shipments.   AMS speeds the flow of cargo and entry
processing and provides participants with electronic authorization to
move cargo release prior to arrival.   AMS facilitates the intermodal
movement and delivery of cargo by rail and trucks through the In-bond
system.

23.   The In-bond numbers utilized in tracking in AMS, and
other electronic databases are generated electronically by ACS.   To
obtain In-bond number(s) a requesting party from the trade community
contacts a Customs port in writing and provides (1) their filer code
or importer number, (2) the quantity of numbers requested (100 to
500,000), and (3) their return address or fax number.

//

//

V.

**SYNOPSIS STATEMENT**

34.   Beginning in or about February 2009, I have been
conducting an investigation involving the theft of importer
identities used to facilitate the smuggling of counterfeit
merchandise through the port at the Los Angeles Airport ("LAX"),
in Los Angeles, California.  During my investigation, I
identified LAI and others as upper echelon members of a criminal
organization that stole importer identities to facilitate the
smuggling and trafficking of counterfeit goods.

35.   In March 2010, I learned that a Customs bonded and
licensed foreign trade zone called Southern California 3rd Party
Logistics and Industry Free Trade Zone, doing business as
("dba") Industry Free Trade Zone ("Industry FTZ"), owned and
operated by LAI and located at 14967 East Salt Lake Avenue, City
of Industry, California, 91746 (**SUBJECT PREMISES**) appeared to be
involved in a different fraudulent scheme to exploit the T&E in-
bond process by entering merchandise from the People's Republic
of China ("China") into United States commerce without entry of
the merchandise or payment of duties ("T&E in-bond diversion
scheme").  As discussed further in the following section
(Probable Cause Statement), Cell 1 utilized Industry FTZ
(**SUBJECT PREMISES**) to submit electronic entries with CBP that
reflected in-bond movement of merchandise from Industry FTZ to

19

the Otay Mesa, California port of entry ("Otay Mesa") for exportation to Mexico. A subsequent review of CBP records, however, reflected that the merchandise had never arrived at Otay Mesa or been exported to Mexico.

36. A review of CBP records demonstrated that a Customs brokerage company called ITC-DILIGENCE had submitted the aforementioned T&E electronic entries to CBP on behalf of Cell 1. A review of CBP and HIS databases and evidence obtained during this investigation revealed that ITC-DILIGENCE is operated by HARLOW (as President) and ELDER (as Import Supervisor/Zone Administrator). During my investigation, I learned that ITC-DILIGENCE had applied for and received a license from CBP to operate Industry FTZ (**SUBJECT PREMISES**) as a foreign trade zone even though LAI was the owner and operator of INDUSTRY FTZ. Notably, LAI, HARLOW, and ELDER never disclosed the fact that LAI owned and operated Industry FTZ to CBP, even though the application process for an operator's license required the identification of employees of a foreign trade zone.

37. During this investigation, I also learned that after CBP had discovered the T&E in-bond diversion scheme in March 2010, LAI, HARLOW, ELDER, HUANG, HOU, HO, WANG, CHOO, WONG, and LIN engaged in a different type in-bond diversion scheme, which involved submitting I.T. in-bond filings to CBP that falsely

reflected in-bond movement of shipments from the seaport to Industry FTZ (**SUBJECT PREMISES**). In addition, as described further below, LAI, HARLOW, and ELDER would file entry documents with CBP that falsely undervalued the shipments and misclassified the imported merchandise in order to generate a lower (false) duty rate and amount of duty owed to CBP (the "undervaluation and misclassification schemes").

38. During this investigation, pursuant to a federal search warrant obtained on October 15, 2010, I reviewed filtered email content from an email account subscribed to and utilized by LAI ("LAI's email account"). LAI's email account contained communications regarding the fraudulent activities of Cell 1 and Cell 2. More specifically the email communications discussed, among other things, the prices charged for the misclassification and diversion of imported merchandise, instructions regarding the direct delivery of merchandise from the seaport to various warehouses in California (by-passing actual admission into Industry FTZ), how payments were to be made for the misclassified and diverted merchandise (e.g. nominal amounts wire transferred into Industry FTZ's business bank account, while larger amounts were wire transferred into various "straw" accounts (as discussed in the next paragraph), and included attachments (such as original China invoices) that reflected the

undervaluation of merchandise and false entry values made at the time of entry.

39.   During this investigation, I identified approximately 10 bank accounts, held at three separate banks, which were utilized by LAI during the period of June 1, 2009, through December 21, 2010.  Of the 10 bank accounts, I identified six of the bank accounts as "straw" accounts that appeared to be in the names of LAI'S family members and friends (non-resident Chinese nationals).  The straw accounts consistently received international wires in amounts ranging from $9,985.00 to $59,980.00 per incoming wire, including wire transfers from HUANG that corresponded with payments for diverted shipments (as reflected in bank records and email communications for LAI's email account).  Moreover, bank records reveal that LAI consistently withdrew money from the straw accounts by way of cash withdrawals, personal checks, or cashier's checks and moved/transferred the funds among her 10 bank accounts.  Based upon these facts and the results of my investigation (as further described below), I believe that LAI was utilizing the straw accounts to launder proceeds of the in-bond diversion scheme. The six "straw" bank accounts are identified as follows:

a.   Bank of the West Account number XXX-XXX673 in the name of Hongwen Peng, opened on November 9, 2002, with an opening deposit of $4,000.00 ("straw account one"). Bank records

listed LAI's residential address and cellular telephone number for Hongwen Peng and showed that a power of attorney ("POA") was issued to LAI on November 12, 2002;

b.   Bank of the West Account number XXX-XXX865 in the name of Qixing Lai, opened on August 19, 2003, with an opening deposit of $10,000.00 ("straw account two"). Bank records listed LAI's residential address and cellular telephone number for Qixing Lai and showed that a POA was issued to LAI on August 19, 2003; and,

c.   Bank of the West account number XXX-XXX691 in the name of Yonghe He, opened on August 19, 2003, with an opening deposit of $10,000.00 ("straw account three"). Bank records listed LAI's residential address and residential telephone number for Yonghe He and showed that a POA was issued to LAI on August 19, 2003.

d.   East West Bank account number XXXXX760 in the name of Yonghe He, opened on October 29, 2009 ("straw account four"), with an opening deposit of $300.00 made by check drawn from one of LAI's bank accounts at Bank of America ("LAI's BofA account"). Bank records listed LAI's residential address and residential telephone number for Yonghe He and showed that a POA was issued to LAI on October 29, 2009;

e.   East West Bank account number XXXXX927 in the name of Qixing Lai, opened on October 29, 2009 ("straw account

23

five"), with an opening deposit of $300.00, which was a check drawn from LAI's BofA account. Bank records listed LAI's residential address and residential telephone number for Qixing Lai and showed that a POA was issued to LAI on October 29, 2009; and,

   f.  East West Bank account number XXXXX867 in the name of Yonggang Fei, opened on February 12, 2010 ("straw account six"), with an opening deposit of $300.00 in U.S. currency. Bank records listed LAI's residential address, residential telephone number, and cellular telephone number for Yonggang Fei and showed that a POA was issued to LAI on February 12, 2010.

(collectively referred to as "the straw accounts").

## VI.  STATEMENT OF PROBABLE CAUSE

### A.  Discovery of T&E In-Bond Diversion Scheme

  40.  On or about March 8, 2010, CBP Officer ("CBPO") Robert Flores contacted me about an in-bond diversion scheme involving Industry FTZ and ITC-Diliegence. CBPO Flores was stationed at the Otay Mesa, California port and told me the following:

   a.  On December 30, 2009, I.T. in-bond number 861563920 was electronically filed at the seaport of Long Beach, California (the "seaport") for a shipment that consisted of 518 cartons described as "wearing apparel," with a provided domestic value of $80,233.00, and a listed shipper and consignee of

"Miracle Mountain Inc." ("IN-BOND SHIPMENT #1")  The I.T. in-bond number filed for IN-BOND SHIPMENT #1 was filed electronically by ITC-DILIGENCE, reflecting in-bond movement of IN-BOND SHIPMENT #1 from the seaport to INDUSTRY FTZ.

       b.   On January 2, 2010, IN-BOND SHIPMENT #1 was issued a foreign trade zone admission number ("FTZ admission number") 243000210ZF100187, by ITC-DILIGENCE, granting admission of IN-BOND SHIPMENT #1 into a foreign trade zone.  According to CBP records, IN-BOND SHIPMENT #1 was electronically admitted into FTZ port 2783, site two, otherwise known as INDUSTRY FTZ (**SUBJECT PREMISES**).

       c.   On January 2, 2010, IN-BOND SHIPMENT #1 was issued T&E in-bond number 861563931, by ITC-DILIGENCE, to depart Industry FTZ (**SUBJECT PREMISES**) for immediate export to Mexico.  According to ACS records, IN-BOND SHIPMENT #1 departed Industry FTZ (**SUBJECT PREMISES**) on January 4, 2010, and arrived at Otay Mesa on January 6, 2010, for export to Mexico.  According to CBPO Flores, however, IN-BOND SHIPMENT #1 never physically arrived at the Otay Mesa and, consequently, was never exported to Mexico from Otay Mesa (T&E in-bond diversion).

       d.   On March 8, 2010, CBPO Flores contacted the listed bonded carrier for IN-BOND SHIPMENT #1, which was Camacho Brokers, Inc., dba Camacho Trucking, ("Camacho Trucking") located in San Diego, California.  Camacho Trucking told CBPO

Flores that they had no knowledge of IN-BOND SHIPMENT #1 and had never heard of, nor done business with, ITC-DILIGENCE or "Miracle Mountain Inc." Camacho Trucking told CBPO Flores that they did not authorize ITC-DILIGENCE to utilize Camacho Trucking's bond identity number and that Camacho Trucking had their bond identity stolen.

e. On March 10, 2010, CBPO Flores spoke to HARLOW at ITC-DILIGENCE about the in-bond numbers assigned to IN-BOND SHIPMENT #1 and advised that IN-BOND SHIPMENT #1 had not been exported to Mexico, contrary to ITC-DILIGENC's electronic filings to CBP. HARLOW confirmed that ITC-DILIGENCE had filed the in-bond numbers for IN-BOND SHIPMENT #1 and stated that IN-BOND SHIPMENT #1 was still physically located at Industry FTZ (**SUBJECT PREMISES**) because the shipper/consignee had not retrieved it. HARLOW stated that ITC-DILIGENCE forgot to cancel the T&E in-bond number that had been issued.

f. On or about March 16, 2010, CBP Port Director for port 2783, Nancy Gooden, received a letter from ELDER regarding IN-BOND SHIPMENT #1. In that letter, ELDER stated that Camacho Trucking had picked up IN-BOND SHIPMENT #1 on January 4, 2010 for T&E movement to Otay Mesa. ELDER further stated that on January 7, 2010, ITC-DILIGENCE's customer asked to cancel the T&E movement but that ELDER had already left the office that day

and forgot to cancel the T&E or confirm the return of IN-BOND SHIPMENT #1.

41. Based on review of CBPO Flores' statements and a review of ELDER's letter, I discovered the following:

a. On March 10, 2010, HARLOW told CBPO Flores that IN-BOND SHIPMENT #1 was never picked up and that IN-BOND SHIPMENT #1 was still located in Industry FTZ (**SUBJECT PREMISES**). However, on or about March 16, 2010, ITC-DILIGENCE wrote to CBP Port Director Gooden that IN-BOND SHIPMENT #1 was picked up by the shipper/consignee on January 4, 2010, and was no longer in INDUSTRY FTZ;

b. On January 6, 2010, ITC-DILIGENCE recorded (electronically) in ACS that IN-BOND SHIPMENT #1 had already arrived at the Otay Mesa for export to Mexico. However, on or about March 16, 2010, ITC-DILIGENCE wrote that their customer had contacted them on January 7, 2010, to cancel the movement of IN-BOND SHIPMENT #1, a full day after IN-BOND SHIPMENT #1 had supposedly "arrived" at Otay Mesa for export to Mexico;

c. ITC-DILIGENCE utilized Camacho Trucking's bond carrier identity without Camacho Trucking's authorization or knowledge; and

d. ELDER and HARLOW failed to address the current whereabouts of IN-BOND SHIPMENT #1 or the fact that IN-BOND SHIPMENT #1 (which contained foreign merchandise) was never

presented to CBP for proper entry into United States commerce
i.e. examination, duties, taxes, etc.

42. On March 22, 2010, I was contacted by CBPO Doug Dlouhy
regarding an in-bond shipment for "View Top Industry, Inc.,"
which had been mis-manifested as 1,100 cartons of "kitchen
utensils" (i.e. the shipment contained drug paraphernalia).
CBPO Dlouhy told me that after discovering drug paraphernalia
consigned to "View Top Industry, Inc.," he looked in various CBP
electronic databases for previous shipments consigned to "View
Top Industry Inc." that had not been examined by CBP and
determined the following:

a. A previous shipment for "View Top Industry, Inc."
had been entered into the seaport on January 13, 2010, as
containing "kitchen utensils" ("IN-BOND SHIPMENT #2"). IN-BOND
SHIPMENT #2 had been issued I.T. in-bond number 861564012, by
ITC-DILIGENCE, and was granted admission into Industry FTZ
(**SUBJECT PREMISES**) under FTZ admission number 243000210ZFI00194.

b. On or about January 14, 2010, IN-BOND SHIPMENT #2
was removed from Industry FTZ (**SUBJECT PREMISES**) on T&E in-bond
number 861564023 (filed electronically by ITC-DILIGENCE) to be
exported to Mexico. The listed bonded carrier for IN-BOND
SHIPMENT #2 was Camacho Trucking.

c. According to CBP records, IN-BOND SHIPMENT #2 had

not been exported to Mexico and had not made formal entry into the United States.  According to CBPO Doug Dlouhy, it appeared that IN-BOND SHIPMENT #2 had been diverted into United States commerce without inspection and without paying duties.  CBPO Dlouhy noted that both the listed shipper and consignee for IN-BOND SHIPMENT #2 was "View Top Industry, Inc." with the same United States address.

      d.    After conducting database queries looking for other in-bond departures from Industry FTZ (**SUBJECT PREMISES**), CBPO Dlouhy found an additional 53 shipments dating back to March 2009, which had been manifested as "wearing apparel" and been issued T&E in-bond numbers for transportation and export to Mexico via "Camacho Trucking."  According to CBP records, the 53 T&E shipments were still "open," meaning they had not been exported to Mexico. (as referenced above, Camacho Trucking had no knowledge of ITC Diligence).

      e.    The in-bond numbers that were utilized for IN-BOND SHIPMENT #1, IN-BOND SHIPMENT #2, and the 53 additional in-bond shipments were part of the same block of 1,000 in-bond numbers (86155802 thru 86156801) that had been issued on September 15, 2005, to Qantas Airways.

    43.  On March 31, 2010, I spoke to HSI SA James Yates, an agent in the Commercial Fraud Group at the HSI Special Agent in Charge office in San Diego, California, regarding the status of

the aforementioned 53 T&E in-bond shipments. SA Yates told me the following:

a.    SA Yates contacted CBPO Flores who examined the in-bond records for the 53 T&E in-bond shipments and determined that CBP records showed that all 53 shipments had "electronically arrived" at Otay Mesa but there were no records of the 53 shipments having been physically exported through Otay Mesa. CBPO Flores explained that if the 53 T&E in-bond shipments had been exported, CBP records would show the shipments as "close" and there would be a perforated copy of the in-bond manifest (CBP Form 7512).

b.    Based on CBPO Flores' research, there was no evidence or paperwork that showed that any of the 53 T&E in-bond shipments had ever physically arrived at Otay Mesa or were exported to Mexico from any port in the United States.

44.  On May 14, 2010, SA Timothy Lawson and I went to the address that was provided for Miracle Mountain, Inc. and the address that was provided for View Top Industry, Inc., as reflected in IN-BOND SHIPMENTS #1 and #2, respectively. SA Timothy Lawson and I discovered that the each address was a UPS store.

45.  The California Secretary of State's website listed both "Miracle Mountain, Inc." and "View Top Industry, Inc." as

30

dissolved companies with the individual listed as the agent for service of process.

### B. Audio-Recorded Communications Involving LAI

46. On May 26, 2010, I had a cooperating source ("CS") (who I had previously arrested as the result of a controlled delivery of counterfeit merchandise that had been smuggled into the United States utilizing the stolen importer identity theft scheme) establish contact with LAI.

47. On June 9, 2010, CS placed a consensually recorded call to LAI. The conversation was in the Chinese language which was later translated and transcribed into English. I reviewed the transcription of the conversation between CS and LAI, which included the following:

a. CS asked LAI if she was still involved in the air shipping business. (I believe based on my aforementioned investigation into importer identity theft that the term "air shipping" is a reference for smuggling counterfeit merchandise through LAX via importer identity theft). LAI stated that she was no longer involved in "air shipping" because LAI was busy dealing with containers (imported merchandise from the seaport).

b. CS asked if it was okay to use "air shipping" information that LAI had provided in the past. In response, LAI said it was best not to use the information.

31

c. LAI told CS that LAI was shipping containers of "Kasil" jeans from Industry FTZ (**SUBJECT PREMISES**) to someone in Hawaii who had connections to sell them. LAI stated that three or four containers were leaving "her place" every month and that though duty was high on jeans, LAI "took care of that part" and absorbed the high duty rate for her client.

48. On June 16, 2010, CS went to Industry FTZ (**SUBJECT PREMISES**) and met with LAI. CS was equipped with a digital recorder and an open line cell phone monitored by ICE agents, including myself. The meeting took place in the Chinese language and was later translated and transcribed into English. I reviewed the transcription of the conversation between CS and LAI, which included discussion of in-bond diversion of shipments and misclassification of merchandise to avoid higher duty rates for which LAI receives half the amount of saved proceeds.

49. On July 28, 2010, CS met with LAI and discussed CS's purported customers that might be able to utilize INDUSTRY FTZ in the in-bond diversion schemes and the undervaluation and misclassification schemes. The consensually monitored and recorded meeting took place in the Chinese language and was later translated and transcribed into English, which contained the following information:

a. LAI warned CS that she could not undervalue

merchandise too far from the actual price, because they (LAI and her Customs broker) would not be able to file a paperless entry with CBP. LAI told CS that LAI's Customs broker knew garments from the inside out;

b. LAI told CS that all the shipments were cleared through LAI, so that it did not matter what a client previously had declared as the value of the merchandise. LAI explained that she helped the client change the value (mis-classify). LAI indicated that jeans would be declared at a 2.8% duty rate, even though the applicable duty for women's jeans is 16.6% under Harmonized Tariff Schedule ("HTS").

c. LAI warned CS that clients could only clear merchandise in this way (undervalued and misclassified) through LAI (through Industry FTZ (**SUBJECT PREMISES**)) and that they would not dare enter merchandise this way directly at Customs (i.e. at the seaport);

d. LAI said importers would usually undervalue the jeans, for example, at $1.00 per unit instead $15.00 per unit, but would never misclassify or mis-describe the jeans (indicating that misclassification would be done at(**SUBJECT PREMISES**);

e. LAI indicated that although a shipment would show transport to INDUSTRY FTZ in the Customs database system, LAI would clear the shipment as soon as it was out of the port

(seaport) and deliver it directly to the customers.  LAI said that her method saved the importers money;

    f.    CS again inquired about "air shipping," to which LAI advised CS to wait a little longer because a mutual acquaintance had been arrested in June (2010) for trafficking in counterfeit merchandise.  LAI stated that Customs was very strict and that it was best to leave "air shipping" alone;

    g.    LAI stated that her method (in-bond diversion, misclassification and undervaluation) was well protected;

    h.    LAI stated that she emailed her customers a "POD" (paid on delivery) as soon as a container was delivered.  LAI stated that all the services were focused on timely delivery of the merchandise.  LAI stated that the customers paid trucking costs from the port (seaport) to their own warehouse and estimated the trucking costs from the port (seaport) to downtown (Los Angeles) was approximately $250.00;

    i.    LAI told CS that if a customer had business checks the customer could write a check to LAI's company account (the Industry FTZ business bank account) and wire the rest of the money owed to LAI's Hong Kong bank account.  CS told LAI that his purported customers had business and bank accounts in Hong Kong so wiring money to LAI's Hong Kong bank account was not a problem.  LAI stated that she specifically set up a Hong

Kong bank account for that very reason.  LAI also told CS that
LAI would pay CS in case for his part.

50.  During this investigation, CS and LAI exchanged the
following emails, copies of which I have reviewed: [1]

a.  E-mail #1:

Tuesday, August 3, 2010, 9:10 PM[2]
From:  [CS]
To:  [LAI]
Subject:  values from [REDACTED]
Hi Julia,
pls see the numbers below:  I figure that after deducting the
duty amount (with lowered value and lowered duty rate), we and
my customer can split the difference.  Pls let me know what you
think.
30,000 pieces of jeans (not counterfeit)
Usual value of $4.00ea for a total value of $120,000.00
Usual shipment is 16% duty so $19,200.00
Thanks.

b.  E-mail #2:

Wednesday, August 4, 2010, 11:16:13 AM
From:  Wei LAI
To:  [CS]
Subject:  Re:  values from [REDACTED]
Hi [CS],
If your costomers [sic] can provide the invoice as $2.00 per
pant, and we will classify as duty rate 2.8% (rayon) [sic], then
duty will be around $2000.00.  So your customer will save about

---

[1]    The e-mail numbers are intended solely to identify the
particular e-mails in this affidavit and do not represent the
entire volume of e-mails exchanged between the parties or in the
government's possession.

[2]    The time stamps reflected in this affidavit are the
time stamps as they appear in the e-mails I have reviewed.  The
e-mails are presented in this affidavit in chronological order
as best I can reconstruct them.  To the extent that the time
stamps do not appear chronologically, that may be due to the
different time zones in which the sender and receiver were
located.

$8500.00, and we charge $8500.0.  I will cut you $1000.00 per
container.  But if more than 5 containers per month, I will cut
you $1500.00 per container.
Thanks.

        c.    <u>E-mail #3:</u>

Wednesday, August 4, 2010, 8:49:57 PM-0700 (PDT)
From: [CS]
To: Wei LAI
Subject: Re: values from [REDACTED]
Hi Julia,
I will let my customer know.
About my cut, can you give me $1500/container, for 5 or more
containers per month, you give me $2000/container?

        d.    <u>E-mail #4:</u>

Thursday, August 5, 2010, 4:53 AM
From:  [LAI]
To:  [CS]
Subject: Re: values from [REDACTED]
Ok!
Sent via BlackBerry from T-Mobile

        e.    <u>E-mail #5:</u>

Thursday, August 5, 2010, 6:18 PM
From: [LAI]
To:  [CS]
Subject: Re: values from [REDACTED]
Hi [REDACTED],

Also tell your customers Bill of Lading just say Woven Pants,
and let my broker handle ISF file
Thanks.

        f.    <u>E-mail #6:</u>

Thursday, August 5, 2010, 11:34:31 AM
From:  [CS]
To:  [LAI]
Subject:  Re:  values from [REDACTED]

Hi Julia,
Did you just call me?  Anyways, my customer is still evaluading
[sic] the risks.  They can change the description on B/L.  But

if they can change the info and numbers themselves, they can use their own broker to do the clearance.  We have to give them a reason that they have to use your FTZ this way.

       g.   E-mail #7:

Friday, August 6, 2010, 12:32 AM
From:  [CS]
To:  [LAI]
Subject:  Re: values from [REDACTED]

Hi Julia,
My customer agreed to our terms and price.  But they want to be careful at the beginning.  They are going to send in some jeans by air in a few days.  They want to use it as a test since it has relatively smaller amount involved.  They propose that they pay us a $5000 flat fee this time which covers everything including clearance, duty, p/u and trucking.  I believe the destination is within California.  So if you can do this, let me know.  I will have them do the paperwork.
Thanks.

       h.   E-mail #8:

Friday, August 6, 2010, 10:23:20 AM
From:  [LAI]
To:  [CS]
Subject:  Re: values from [REDACTED]

Hi [CS],
Can not try with Air shipment, because 7512 (inbound [sic] file) does not go paperless with LAX system.  It always docs required.

However, we can try loose carge [sic] or 20 feet [sic] container first.  Any shipment comes in from Long Beach, in-bound [sic] movement goes paperless.

Pls let me know.  Any [sic] make sure give ISF info for my broker to file with Customs.

       i.   E-mail #9:

Friday, August 6, 2010, 9:24 PM
From:  [CS]
To:  [LAI]
Subject:  Re: values from [REDACTED]

Hi Julia,

My customer has a lot on [sic] stake.  They need to try out with a smaller shipment first and they do not want to split a container load just for testing purpose.  They are flying a few hundred boxes in for a new customer.  So they thought this could be our chance to try your service.  And they are willing to pay for any extra charges may occur.  Pls let me know ASAP coz [sic] this could be our only chance to get their business, which will be a lot every month.

        j.    E-mail #10:

Wednesday, August 11, 2010
From:  [LAI]
To:  [CS]
Subject:  Fw:

Hi [CS],

Pls see the attached docs.  This is a container with 1216 cartons of pants, invoiced @ $1.00 per pant and total 29144 pants, with a total value of $29144.  My broker filed 7512 (on 7/30, before ETA), then filed 214 and consumption entry on 8/2, when the container arrived.  Everything past through paperless, and the container was delivered from port to the customer's warehouse on 8/3 when it became immediately available @ the port.

    51.   E-mail #10 contained the following five attachments:

        a.    CBP Form 7512, Transportation Entry and Manifest of Goods Subject to CBP Inspection and Permit;

        b.    CBP Form 214, Application for Foreign Trade Zone Admission and/or Status Designation;

        c.    CBP Form 3461, Entry/Immediate Delivery;

        d.    Commercial Invoice; and,

        d.    Packing List.

The attachments had the consignee's name and address blocked, but other identifying information regarding the in-bond, FTZ

admission, and entry were visible.  The in-bond number issued
for the shipment was 861565821, which was part of the same block
of 1,000 in-bond numbers that CBPO Dlouhy had stated were issued
to Qantas Airways in 2005 (diverted T&E shipments).

52.  Based on information provided by LAI to CS in recorded
calls, e-mails, and meetings, it appears that LAI routinely
undervalued and misclassified shipments of merchandise that were
diverted in the in-bond diversion schemes.  Provided below is an
example of the suspected loss of revenue to the United States by
comparing the declared value (undervalued) and duties
(misclassified) that were filed with CBP for the shipment
referenced in E-mail #10, to that of an approximated correct
declared value and correct corresponding duty.  (The values
listed below were obtained from previous similar shipments
associated with LAI, examples provided by LAI to cooperating
sources in conversation or via e-mail, and/or were provided by
CBP IS Ach based upon his knowledge, training and experience.)

**E-mail #10 shipment actual values declared**

- Value at $1.00 (undervalued) per piece:  $29,144.00

- Duty rate (misclassified) at 2.8%

- Duties paid:  $29,144.00 x 2.8% = $816.03

**E-mail #10 shipment suspected true values**

- Shipment value at $4.00 (low) per piece:  $116,576.00

- Shipment value at $15.00 (high) per piece: $437,160.00

- Duties owed:  $116,576.00 x 16.6% = $19,351.62

- Duties owed:  $437,160.00 x 16.6% = $72,568.56

Therefore, the total suspected loss of revenue to the United States for the E-mail #10 shipment was at least $18,535.59, but based on LAI's example to CS, could have been as high as $71,752.53.

53.   Pursuant to a federal search warrant, I obtained e-mail communications from LAI's email account, for the approximate time period from March 1, 2009 through October 18, 2010, which contained e-mail communications involving LAI, HARLOW, ELDER, HUANG, HOU, HO, WANG, CHOO, WONG, LIN, and unknown co-conspirators regarding the in-bond diversion, undervaluation, and misclassification schemes.  Given the volume of emails reflecting the fraudulent activities of both Cell 1 and Cell 2, I have included examples of fraudulent activities by Cell 1 and Cell 2 to demonstrate probable cause for application of a search warrant, complaints, and arrest warrants as described above.  The examples do not represent the entire volume of emails exchanged between the parties or in the government's possession.

54.   Pursuant to a federal order authorizing the

interception of a cell phone subscribed to and utilized by LAI,
I received intercepted real time communication from the time
period of July 26, 2010, to August 24, 2010.  Given the volume
of intercepted communications reflecting the fraudulent
activities of both Cell 1 and Cell 2, I have included examples
of fraudulent activities by Cell 1 and Cell 2 to demonstrate
probable cause for application of a search warrant, complaints,
and arrest warrants as described above.  The examples do not
represent the entire volume of intercepted communications
exchanged between the parties or in the government's possession.

C.   **Activities of CELL 1**

55.   Based upon my review of records, recordings, emails,
and intercepted calls as referenced above, I believe that HUANG,
HOU, HO, CHOO, and others, doing business as Pacific Garment,
Sealand International Limited ("Sealand"), New Live Inc., and
Miracle Mountain Inc., engaged in T&E in-bond diversion
utilizing the services of Industry FTZ (**SUBJECT PREMISES**) and
ITC-DILIGENCE during the period from on or about September 13,
2009, through on or about February 28, 2010.  More specifically,
as reflected in communications from LAI's email account, HUANG,
HOU, HO, and others would often email importation documents to
LAI, ELDER, and WANG (such as the original China commercial
invoice, packing list, and delivery instructions to deliver
shipments to warehouses in the Los Angeles area).

56.   For example (based upon review of email communications, corresponding CBP filings, and bank records):

a.   In an email between LAI and WANG on September 30, 2009, LAI instructed WANG to ask HUANG for payment of 15 shipments containing wearing apparel from China.  LAI also provided WANG with 15 shipping invoices, totaling approximately $17,593.00 in "Warehousing Services," from Industry FTZ (**SUBJECT PREMISES**) to Pacific Garment.  Each invoice identified the specific importation via the Bill of Lading or container number and provided delivery instructions to deliver the shipments to various warehouses in the Los Angeles, California area.  According to the email, HUANG was to wire transfer the $17,593.00 into Industry FTZ's business bank account.

b.   All 15 shipments were consigned to "Miracle Mountain, Inc." and were issued T&E in-bonds, by ITC-DILIGENCE, for export to Mexico.  None of the 15 shipments arrived at Otay Mesa for exportation nor were they ever presented to CBP for entry.

c.   In an email between LAI and WANG on September 24, 2009, LAI instructed WANG to ask HUANG to wire $35,000.00 into straw account one.

d.   In an email between LAI, WANG, and HUANG on October 9, 2009, LAI instructed HUANG to wire $56,000.00 into straw account three.

e.   In an email between LAI, WANG, HO, and HUANG on October 30, 2009, HUANG instructed LAI to revise the shipping invoices to be addressed to Sealand, instead of Pacific Garment.

f.   HUANG made the following three payments for the 15 shipments:

i.   September 25, 2009:  one international wire payment in the amount of $48,980.00, from Sealand, into straw account one;

ii.   October 13, 2009: one international wire payment in the amount of $55,980.00, from Sealand, into straw account three; and,

iii. October 15, 2009: one international wire for payment in the amount of $17,593.00, from Sealand, into Industry FTZ's business bank account.  (It appears based upon my investigation as described above that the shipping invoices and payment of $17,593.00 into the Industry FTZ's business account was made to create a false paper trail reflecting in-bond movement through Industry FTZ (**SUBJECT PREMISES**).

57.   For example (based up review of email communications, corresponding CBP filings, and bank records):

a.   On or about February 11, 2010, in an email communication, LAI, WANG, and HOU received a commercial invoice for a shipment from China consigned to "Miracle Mountain, Inc."

which contained 865 cartons of wearing apparel valued at approximately $106,471.50 (the "865 shipment");

b.    On or about February 18, 2010, in an email communication, LAI, WANG, and HOU received instructions to pick up the 865 shipment from the seaport and deliver it to CHOO's warehouse, Howell Logistics, located in Fullerton, California;

c.    On or about February 21, 2010, ITC-DILIGENCE, assigned an I.T. in-bond number to the 865 shipment and filed a transportation entry (CBP Form 7512), which reflected that the 865 carton shipment had moved in-bond from the seaport to Industry FTZ (**SUBJECT PREMISES**);

d.    On or about February 23, 2010, in an e-mail communication, WANG informed LAI that the 865 shipment had been "unloaded" at Howell Logistics in Fullerton, California, and that ELDER indicated that it was "more safe and better" to deliver the China shipments directly to the warehouse.

e.    On or about March 2, 2010, LAI e-mailed HUANG, WANG, and HO with an invoice for the 865 shipment (along with three other invoices related to three other shipments) and instructed HUANG to wire transfer $3,360.00 into the Industry FTZ business bank account as warehousing services for the 856 shipment.

f.    On or about March 5, 2010, Sealand wire transferred approximately $39,980.00 into straw account three as

payment for the 865 shipment and three other shipments that ITC-
DILIGENCE had filed for T&E in-bond movement through Industry
FTZ (**SUBJECT PREMISES**).

     g.   A review of CBP records showed that although ITC-
DILIGENCE filed transportation entries with CBP representing
that the 865 shipment had been transported I.T. in-bond from the
seaport to Industry FTZ (**SUBJECT PREMISES**) and then transported
T&E in-bond from the Industry FTZ (**SUBJECT PREMISES**) to Otay
Mesa for exportation to Mexico, there was no record of the 865
shipment physically arriving at Otay Mesa or having been
exported to Mexico.

     h.   Based on the investigation as described above, I
believe that the 865 shipment had been unlawfully diverted and
relanded into U.S. commerce without having paid any duties or
taxes (T&E in-bond diversion scheme).

    58.  Based upon a review of communications from LAI's e-
mail account, I know that LAI generally charged approximately
$10,000.00 per T&E in-bond diverted shipment and sometimes
offered a discounted bulk rate of $6,000.00 per diverted T&E
shipment.  In addition, the international wire transfer of money
from Sealand paralleled the paper trail payments (Industry FTZ
shipping invoices) that LAI had created to avoid detection by
CBP.

59. As another example (based upon review of email communications, corresponding CBP filings, and bank records):

a. On or about March 29, 2010, following CBP's inquiry to ITC-DILIGENCE regarding the missing IN-BOND SHIPMENT #1, LAI advised WANG, in an email communication, that ELDER was having difficulties finding a trucking company who would go to their "destination warehouse in Mexico." (Based upon the investigation as described above, I believe that LAI, WANG, and ELDER were trying to create a paper trail reflecting transportation to Mexico, in the event that CBP questioned them further about T&E in-bond shipments). As reflected below, it appears that the CBP inquiry of IN-BOND SHIPMENT #1 caused Industry FTZ (**SUBJECT PREMISES**) and ITC-DILIGENCE to modify/change their fraudulent scheme (from T&E in-bond diversion to I.T. in-bond diversion and misclassification).

b. On or about April 11, 2010, in an email communication, LAI advised HUANG and HO that incoming China shipments should be consigned to "RCW International Inc." and delivered to the warehouse in Fullerton, California (CHOO's warehouse, Howell Logistics) in order to "avoid any hassels."

c. On or about April 26, 2010, in an email communication, LAI asked HO to refer a freight forwarder to her, because LAI needed "legitimate business badly." On or about June 15, 2010, in an e-mail communication, LAI, WANG, and HOU

received a commercial invoice for a China shipment consigned to "RCW International Inc.", which contained 750 cartons of wearing apparel that had been valued on the invoice at approximately $132,251.35 ("the 750 shipment").

      d.   On or about June 17, 2010, in an email communication, LAI, WANG, and HOU received instructions to retrieve the 750 shipment from the seaport and deliver the 750 shipment to Howell Logistics in Fullerton, California (CHOO's business).

      e.   On or about June 20, 2010, ITC-DILIGENCE assigned an I.T. in-bond number to the 750 shipment and filed a transportation entry (CBP Form 7512), which reflected that the 750 shipment had moved in-bond from the seaport to Industry FTZ (**SUBJECT PREMISES**);

      f.   On or about June 21, 2010, ITC-DILIGENCE filed entry documents for the 750 shipment reflecting an entered value of $41,432.00, fees of $90.14, and duty of $1,833.07, for a total amount of $1,923.21 owed upon entry (Entry Number BPC 0202137-6 and Entry Date June 21, 2010).  I believe this entry value presented to CBP was false because the original China invoice for the 750 shipment reflected a value of at least $132,251.35 (double invoicing).

      g.   On or about July 1, 2010, Sealand wire transferred approximately $4,168.46 into the Industry FTZ's

business bank account for warehousing services related to the 750 shipment and three additional shipments.  On that same day, Sealand also wired approximately $39,980.00 into straw account four as payment for the diverted 750 shipment and three other shipments.

   h.   A review of LAI's emails reflect other similar communications with WANG, ELDER, HUANG, HOU, and HO regarding the I.T. in-bond diversion of shipments consigned to the shell importer companies, "RCW International Inc.," and "Jing Long International Corporation."

   60.   In addition to the email communications and CBP electronic filings, HSI SAs, including myself, and other law enforcement officers, conducted surveillance of shipments, which had been issued I.T. in-bond numbers by ITC-DILIGENCE to travel in-bond to Industry FTZ (**SUBJECT PREMISES**).  Surveillance revealed that assigned I.T. in-bond shipments were diverted from the seaport directly to various warehouses in the Los Angeles area.  For example:

   a.   On August 11, 2010, surveillance was initiated on two in-bond shipments that had had been picked up from the seaport by Yamko Truck Lines and delivered directly to Howell Logistics.

   b. Two Asian males were seen exiting Howell Logistics warehouse.

c. A silver SUV with California license plate XXXX664 arrived at Howell Logistics and parked at an open bay door. An Asian male exited the silver SUV and was observed carrying a small box in his hands as he approached the bay door and then walked to the front door and entered the Howell Logistics facility. Record checks at the time of the in-bond diversion revealed that California license plate XXXX664 belonged to a vehicle registered to WONG at a post office box in Rosemead, California. (On November 23, 2010, record checks of the same plate, XXXX664, revealed that it was registered to "SEASON INTERNATIONAL APPAREL INC" at the same address as TRENDY ANGELA (referenced below)).

d. During monitored and recorded conversations, LAI discussed the in-bond diversion of these two shipments, the exam of the shipments by CBP, the consumption entries being filed by ITC-DILIGENCE, and the coordination of diverting the shipments to the warehouse at HOWELL LOGISTICS. LAI had made arrangements for the retrieval and delivery of the two containers to the Fullerton warehouse (Howell Logistics) and had informed CHOO, HOU, and HO about the status of containers. (Note: intercepted calls were made by LAI to telephone numbers subscribed and utilized by CHOO, HOU, and HO).

//

//

49

### D.  Activities of CELL 2

61.  In email communications involving LAI, ELDER, HARLOW, WONG, and LIN, LAI discussed details of the I.T. in-bond diversion, misclassification, and undervaluation schemes.

62.  For example:

a.  On or about July 26, 2010, in an email communication, LAI, ELDER and LIN received a commercial invoice for a China shipment consigned to Trendy Angela, which contained 1,543 cartons of wearing apparel that had been valued on the original invoice at $76,733.40 ("the 1,543 shipment").

b.  On or about July 26, 2010, in email communication, LAI and ELDER arranged for the delivery of the 1,543 shipment from the seaport directly to a warehouse in Los Angeles, California.

c.  On or about July 21, 2010, ITC-Diligence assigned an I.T. in-bond number to the 1,543 shipment and filed a transportation entry (CBP Form 7512), which reflected that the 1,543 shipment had moved in-bond from the Long Beach, California seaport to Industry FTZ (SUBJECT PREMISES).

d.  On or about July 26, 2010, ITC-DILIGENCE electronically submitted entry for the 1,543 shipment, utilizing a HTS code that reflected a lower duty rate of 2.8% (instead of a HTS code that properly reflected a duty rate of 16.6%).

e.   On July 27, 2010, I asked BNE INCA SA Rigoberto Garcia to conduct surveillance of the 1,543 shipment, along with other officers and SAs of the INCA Task Force.  SA Garcia told me the following, in summary and pertinent part only: that a surveillance team observed the 1,543 shipment depart the seaport and travel directly to a warehouse in Los Angeles where it pulled into an open bay/loading dock.

f.   On or about July 21, 2010, ITC-Diligence filed entry documents for the 1,543 shipment, which reflected an entered value of $28,956.00, fees of $112.33, and duty of $810.77, for a total amount of $923.10 owed upon entry (Entry Number BPC 0202199-6 and Entry Date July 21, 2010).  As mentioned above, the original China invoice for this shipment reflected a value of at least $76,733.40 (double invoice).

g.   On or about July 28, 2010, LAI provided WONG and LIN with an invoice for the 1,543 shipment, which included a $5,000.00 "Handling Charge by Industry FTZ" and totaled $5,610.00.

h.   On or about August 9, 2010, WONG, doing business as 388 Investment Group, paid $11,655.00 into Industry FTZ's business bank account as payment for the diverted 1,543 shipment.  The international wire matched the same invoice number that LAI had placed on the shipping invoice from Industry FTZ (**SUBJECT PREMISES**).

63. In addition to the 1,543 shipment, this investigation revealed that LAI received approximately $174,451.39, during the period of on or about June 16, 2010, through November 23, 2010, for diverted shipments related to CELL 2, which had been deposited directly into the Industry FTZ business bank account. (based upon records matching shipping invoice numbers reflected on checks and wire comments).

64. Based upon continued surveillance, members of CELL 2 have continued to undervalue, misclassify and conduct I.T. in-bond diversions, even as recent as on June 8, 2011. On that date, HSI SAs, including myself, conducted surveillance of a shipment that was consigned to "Jun Yang USA Corporation" and sold in transit to shell importer company, "Manufacturing Direct LLC" that contained 1,328 cartons of wearing apparel from China (the "1,328 shipment"). ITC-DILIGENCE had assigned an I.T. in-bond number to the 1,328 shipment to travel to Industry FTZ (SUBJECT PREMISES). Surveillance of the 1,328 shipment revealed that the 1,328 shipment had been picked up at the seaport and delivered directly to a warehouse in Commerce, owned and operated by LIN.

## VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

65. As used below, the term "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units;

laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes used to store digital data (excluding analog tapes such as VHS), and memory chips; and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of the premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with specially trained personnel who have specific expertise in the type of

digital device, software application or operating system that is being searched.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.     The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 gigabytes (GB) of data are now commonplace in desktop computers.  Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 240 million pages of data, that, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.

Further, a 500 GB drive could contain as many as approximately 450 full run movies or 450,000 songs.

        d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of

an electronic file from a hard drive depends less on when the
file was downloaded or viewed than on a particular user's
operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment.

        e.   Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processor, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant. Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole. Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has
been deleted from a word processing file). Virtual memory paging
systems can leave digital data on the hard drive that show what
tasks and processes on the computer were recently used. Web

browsers, e-mail programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment.

   f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the

absence of particular data requires specialized tools and a controlled laboratory environment.

g.   The United States has not attempted to obtain this data by other means.

## VII.

### ITEMS TO BE SEIZED

66.   Based on the foregoing, I respectfully submit that there is probable cause to believe that the following items, which constitute evidence of violations of Title 18, United States Code, Section 541 (Entry by False Statements); Title 18, United States Code, Section 544 (Relanding of Goods); Title 18, United States Code, Section 545 (Smuggling); Title 18, United States Code, Section 1343 (Wire Fraud); Title 18, United States Code, Section 1001 (False Statements), Title 18, United States Code, Section 1956 (Money Laundering); and Title 18, United States Code, Section 371 (Conspiracy):

a.   CBP filing forms, including but not limited to 3461 (Entry/Immediate Delivery), 7501 (Entry Summary), 214 (Application for Foreign-Trade Zone Admission and/or Status Designation), 216 (Application for Foreign-Trade Zone Activity Permit), 301 (FTZ Operator's Bond), 3171 (Application-Permit-Special License Unlading-Lading-Overtime Services), 7512 (Transportation Entry and Manifest of Goods Subject to CBP Inspection and Permit ), 7514 (Drawback Notice ), 7553 (Notice

of Intent to Export, Destroy or Return Merchandise for Purposes of Drawback), transportation, entry, shipping invoices, manifests, waybills, packing lists, bills of lading, and delivery records or export records for items imported into the United States between February 1, 2009 and the present;

b.   Any packaging materials and equipment or printed materials used to prepare shipments for in-bond diversion, namely: labels, certificates of authenticity, retail commercial boxes, packing materials, other documents, some of which may be unlabeled or labeled;

c.   Purchase orders, claims for payment of purchase orders, contracts, contract modifications, subcontracts, ordering agreements, memoranda and letters of intent, proposals, quotes and requests for quotes, lists of buyers, invoices, records, notes, correspondence, inventory logs, delivery orders, memoranda of telephone messages, certificates of sale, minutes of meetings, diaries, customer lists, corporate records, drawings, specifications, and manufacturing records, journals and other books of original entry or export, general ledgers, relating to, reflecting, or referring to the sale and distribution of importer identities, bonded carrier identities, contraband, counterfeit merchandise, and drug paraphernalia;

d.   Any documentation, keys or access codes showing ownership or control over storage or warehouse space or private storage areas between February 1, 2009 and the present;

e.   Articles of personal property tending to establish the

59

identity of persons who work at the premises, and who own or rent vehicles, detached structures, storage units or containers, to include rent receipts or property/mortgage payments, telephone/cellular telephone billing statements, cancelled checks, utility billing statements, bank statements and correspondence;

f.   Records showing ownership, dominion, or control over **SUBJECT PREMISES** during the period of February 1, 2009, through the present, including utility statements and records, journals, records of occupancy, rental or lease agreements, letters, notes and correspondence;

g.   Travel records associated with the acquisition of importer identities, bonded carrier identities, or merchandise obtained, sold or bought from in-bond diversion or smuggling, including flight plans, flight tickets, hotels, receipts, and passports.

h.   Any computer used to facilitate the above-listed violations and forensic copies thereof.

i.   With respect to any digital devices containing evidence falling within the scope of the foregoing search categories, records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show the actual user(s) of the digital device during the time period between February 1, 2009 and the present.

67.  As used above in paragraphs (a)-(h), the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form, including in digital form on any digital device and any forensic copies thereof.  As used both above and below, the term "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes used to store digital data (excluding analog tapes such as VHS), and memory chips; and security devices.

68.  In searching digital data stored on digital devices, law enforcement personnel executing this search warrant will employ the following procedure:

//

//

a.   Law enforcement personnel or other individuals assisting law enforcement personnel will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location. The team of law enforcement personnel, which may include the investigating agent(s), and/or individuals assisting law enforcement personnel searching the digital device(s) shall complete the search as soon as is practicable but not to exceed 60 days from the date of the execution of the warrant.   If additional time is needed, the government may seek an extension of this time period from the Court within the original 60 day period from the date of execution of the warrant.

b.   The team searching the digital devices will do so only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The team may subject all of the data contained in the digital device capable of containing items to be seized as specified in this warrant to the protocols to determine whether the digital device and any data falls within the items to be seized as set forth herein.   The team searching the digital device may also search for and attempt to recover "deleted," "hidden" or encrypted data to determine, pursuant to

the protocols, whether the data falls within the list of items to be seized as set forth herein.

ii.   The team searching the digital device also may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

c.   When searching a digital device pursuant to the specific protocols selected, the team searching the digital device shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

d.   If the team searching a digital device pursuant to the selected protocols encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that digital device pending further order of Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

e.   If the search determines that a digital device does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will as soon as practicable return the device and delete or destroy all the forensic copies thereof.

f.   If the search determines that the digital device does contain data falling within the list of the items to be

seized pursuant to this warrant, the government will either
(i) within the time period authorized by the Court for
completing the search, return to the Court for an order
authorizing retention of the digital device; or (ii) retain only
a copy of the data found to fall within the list of the items to
be seized pursuant to this warrant and return the digital device
and delete or destroy all the forensic copies thereof.

69.   In order to search for data that is capable of being
read or interpreted by a digital device, law enforcement
personnel are authorized to seize the following items, subject
to the procedures set forth above:

a.   Any digital device capable of being used to
commit, further or store evidence of the offense listed above;

b.   Any equipment used to facilitate the
transmission, creation, display, encoding or storage of digital
data, including word processing equipment, modems, docking
stations, monitors, printers, plotters, encryption devices and
optical scanners;

c.   Any magnetic, electronic or optical storage
device capable of storing data, such as floppy disks, hard
disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks,
printer or memory buffers, smart cards, PC cards, memory
calculators, electronic dialers, electronic notebooks, cellular
telephones and personal digital assistants;

d.    Any documentation, operating logs and reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters and other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, test keys, encryption codes or other information necessary to access the digital device or data stored on the digital device.

//

//

//

//

//

70.   The special procedures relating to digital media found in this warrant govern only the search of digital media pursuant to the authority conferred by this warrant and do not apply to any search of digital media pursuant to any other court order.


Lynn M. Henry
Special Agent
Department of Homeland Security
U.S. Immigration & Customs Enforcement



Subscribed and sworn to before me
this ___ day of June 2011.


HON. MICHAEL R. WILNER
UNITED STATES MAGISTRATE JUDGE

66